# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––

### No. ACM 40053

––––––––––––––––––

### UNITED STATES
*Appellee*

**v.**

### Joseph B. CARLILE
Airman (E-2), U.S. Air Force, *Appellant*

––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 21 September 2022

––––––––––––––––––

*Military Judge:* Bryon T. Gleisner (pretrial motions and arraignment); Mark W. Milam.

*Sentence:* Sentence adjudged on 4 November 2020 by GCM convened at Scott Air Force Base, Illinois. Sentence entered by military judge on 9 December 2020: Dishonorable discharge, confinement for 540 days, reduction to E-1, and a reprimand.

*For Appellant:* Major Jenna M. Arroyo, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Cortland T. Bobczynski, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Judge GRUEN delivered the opinion of the court, in which Senior Judge KEY and Judge ANNEXSTAD joined.

––––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

––––––––––––––––––

GRUEN, Judge:

A military judge sitting as a general court-martial convicted Appellant, consistent with his pleas, of one charge and two specifications of sexual abuse of a child (Charge I) in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[1] Appellant was also convicted, contrary to his pleas, of one charge and two specifications of indecent conduct (Charge III) in violation of Article 134, UCMJ, 10 U.S.C. § 934.[2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 540 days, reduction to the grade of E-1, and a reprimand.[3]

Appellant raises four issues on appeal: (1) whether the military judge erred in allowing the Government to make multiple changes to five specifications after referral and over the Defense's objection; (2) whether the Government was preempted from charging indecent conduct under Article 134, UCMJ; (3) whether the indecent conduct convictions were legally and factually insufficient; and (4) whether his sentence is inappropriately severe.

We find no error materially prejudicial to a substantial right of Appellant and affirm the findings and sentence.

## I. BACKGROUND

Appellant's convictions for sexual abuse of a child arose from him sending pictures of his genitals, on more than one occasion, and a sexually explicit message via electronic means to a female child then 14 years of age. His convictions for indecent conduct arose from him sending pictures of his genitals via

---

[1] Appellant's convictions relate to misconduct occurring between on or about 1 November 2016 and on or about 18 October 2017. As such, references to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise specified, all other references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was found not guilty of two specifications of sexual assault (Charge II) in violation of Article 120, UCMJ, 10 U.S.C. § 920. Before trial, the convening authority withdrew and dismissed four specifications of sexual abuse of a child (Charge I) in violation of Article 120b, UCMJ, and five specifications of indecent conduct (Charge III) in violation of Article 134, UCMJ.

[3] To clarify any ambiguity in the entry of judgment (EoJ), Appellant was awarded a total of 332 days' credit against his sentence. We recognize that the military judge did not enter the judicially ordered credit separate from the pretrial confinement credit. The EoJ should read 221 days were awarded for pretrial confinement credit, and another 111 days for judicially ordered credit, totaling 332 days of credit. Appellant has not alleged error or prejudice, and we find none.

electronic means to two other females, each of whom was 16 years of age at the time of receipt.

## A. Sexual Abuse of a Child

### 1. Additional Background

Appellant graduated from high school in the spring of 2016. He entered active-duty service in the United States Air Force on 27 September 2016. He became 19 years old in December 2016. During the *Care*[4] inquiry into the providence of Appellant's guilty pleas to the sexual abuse of a child specifications, he admitted that while he was in technical school at Keesler Air Force Base, Mississippi—around May or June 2017—he friended[5] a girl named SO on Instagram whom he had previously seen on his younger brother's Instagram account.[6] Appellant's brother was 14 years old at that time, a fact which led Appellant to assume SO was around the same age. During conversations with SO, Appellant learned that she was, in fact, 14 years old and would be a freshman in high school in the fall of 2017. Appellant testified that he thought SO was cute. Even though SO lived in his hometown and Appellant claimed she helped him with his low self-esteem, they had never met in person.

### 2. Sexually Explicit Images Sent to SO

Appellant and SO later began communicating over Snapchat.[7] At first, the communications were cordial and the topics comprised of how each was doing in their daily lives. The messages eventually turned sexual in nature. Appellant admitted to sending SO a picture of his penis through Snapchat on at least two occasions. He told the military judge he knew it was wrong and that he should not have sent the pictures for two reasons: first, because SO never asked him to send pictures of his penis, and second, because she was only 14 years old. Further, when he asked SO if she wanted pictures of his penis, she told him "no," she did not want to receive such images. He admitted that he sent the pictures with the intent to arouse his sexual desires.

SO testified at presentencing and recalled that Appellant sent her at least five pictures of his genitals and one video. The video depicted him masturbating in his bed. When SO told Appellant that she was 14 years old, he responded

---

[4] *United States v. Care,* 40 C.M.R. 247 (C.M.A. 1969).

[5] In this context, when Appellant "friended" SO he added her to his list of contacts on social media such as Snapchat. *See* OXFORD ADVANCED LEARNER'S DICTIONARY, *friended*, https://www.oxfordlearnersdictionaries.com/us/definition/english/friend_2?q=friended (last visited 9 Sep. 2022).

[6] Instagram is a photo and video sharing social networking service.

[7] Snapchat is a messaging platform in which messages and images are automatically deleted after they are viewed or otherwise expire, unless saved.

"that he d[id]n't care." Appellant asked for sexual photos of SO, which she declined to send. Appellant responded by getting angry or threatening to commit suicide. SO claimed that when she received the pictures and video from Appellant, she "was mainly confused but [she] was also angry and sometimes sad." She was confused because she knew he was aware of her age and she knew it was wrong, so she wondered if he knew it was wrong. She was angry because it frustrated her to repeatedly tell the Appellant "no," yet he continued to send her unwanted images. She felt the images were gross, she did not want to see them at her age, and they made her uncomfortable. SO felt sad because she wanted to keep her childish innocence as long as possible, and she felt Appellant took that from her when he sent unsolicited and unwanted pictures of his penis and a video of him masturbating. She testified that she grew up a lot faster than she should have, opining that "[no]body expects that for a child."

### 3. Sexually Explicit Language Sent to SO

Also during his *Care* inquiry, Appellant told the military judge he communicated with SO via Snapchat from about 28 May 2017 until sometime in August or September 2017. According to Appellant, he arrived to his new duty station in the Republic of Korea in July 2017. Sometime after arriving in Korea he sent a Snapchat message to SO that stated words to the effect of,

> I'd kiss you, then kiss your neck, then start to kiss your body and finger you while I suck your nipples. Then I'd start licking your p[**]sy until you beg me to f[**]k you. Then I'll slide my 9-inch c[**]k into your p[**]sy, making you scream and f[**]k you until you can't walk

After SO received the message, she and Appellant got into an argument about the message's content. SO responded rather quickly with "what the h[**]l," or words to that effect, and asked Appellant not to send messages like that to her. It was the last time they communicated. Appellant repeated to the military judge that he knew SO was not yet 16 years old when he sent the message. Appellant admitted he sent the message to arouse his sexual desire and agreed the message was grossly offensive to the community sense of modesty, decency, and propriety.

## B. Indecent Conduct

### 1. Sexually Explicit Images Sent to JH

At trial, JH testified she met Appellant in 2014 when she was a freshman at the high school they both attended. Appellant was two years older than JH and in eleventh grade at the time. However, by the spring of 2016 they had not been in close contact for some time. There was no particular reason they stopped having regular contact—JH said she just had different friends and the group of friends that previously included both her and Appellant "just

disintegrated throughout [her] sophomore year." JH and Appellant did not resume contact until November 2016, after Appellant graduated from Air Force Basic Military Training (BMT) and he reached out to JH by adding her to his Snapchat account.

When she added him back, that enabled him to directly message her. JH testified their intial Snapchat conversations were casual wherein the communications were basically "catching up, how are you, how's high school, how was basic [BMT], things like that." The conversations "slowly began to get sexual." Specifically, Appellant began making non-sexual comments about JH's looks, to which she responded with statements like "thanks." This progressed to Appellant sending messages that included sexually charged compliments, telling JH that she "[had] a nice ass, nice breasts, things [ ] of that nature." JH did not appreciate the sexual comments and told Appellant "to not say things like that." Appellant would respond by apologizing, but he did not stop sending sexual messages to JH.

Instead of stopping, Appellant asked her if she wanted to see his penis. JH testified that she "declined," but Appellant sent the picture via Snapchat regardless. JH described the picture as showing Appellant's erect penis laying on what she believed was his bathroom sink. After JH received the picture, she ignored Appellant. JH testified that she did not respond to Appellant because the picture "wasn't wanted and [she] didn't really know what to say." She thought it was "gross" and it made her feel weird. She wanted to "forget it ever happened." After asking her mother for advice, JH blocked Appellant from interacting with her on Snapchat.

JH testified Appellant used a different account to add her on Snapchat again in February 2017. She added him back, once again giving Appellant the ability to directly message her. Their conversations progressed similarly as described above—initially casual, then complimentary, and finally unwanted sexual advances by Appellant. JH again told Appellant that compliments with sexual connotations made her uncomfortable,[8] yet he again proceeded to ask her if she wanted to see his penis. JH once again declined, but Appellant ignored the declination and sent her a picture of his penis via Snapchat. JH recalled that Appellant was in his bed which had "a navy blue blanket" and she "could see him holding his erect penis up" and she could see "part of his leg." After JH received this picture, she blocked Appellant for the second time.

---

[8] JH testified that while she never used the exact words "I am uncomfortable," when explaining to Appellant that his sexual messages were unwanted, she did express to him that his sexual messages made her uncomfortable by saying things like, "Hey, let's not say that," or "How about we not say those things."

In March 2017, Appellant added JH on Snapchat using a third account he had created. JH added him back. The course of their communications followed the same pattern as the two previous times—the messages eventually turned sexual, JH asked him to stop sending those types of messages, Appellant asked if she wanted to see his genitals, JH declined once again, and once again Appellant sent a picture of his penis anyway. JH described this third picture as similar to the one sent in February, but from a different angle. After JH received this picture, she immediately blocked Appellant.

JH testified that at no time had she asked for pictures of Appellant's penis and that she was offended each time she received these pictures. JH explained she added Appellant back on Snapchat the second and third time because she did not know it was Appellant until after she added him and began communicating with him because he was using new accounts. At all times relevant to the indecent conduct specifications involving JH, she was 16 years old and a high school student.

**2. Sexually Explicit Images Sent to JW**

JW testified that she met Appellant online when she was a freshman in high school. At the time, Appellant was a junior at the same high school and two years older than JW. JW did not meet Appellant in person. She knew who he was, but they did not actually meet online until Appellant added JW on Facebook. Appellant and JW began messaging each other on Facebook until Appellant asked JW for her Snapchat account, which she provided. They then began communicating over Snapchat. The two communicated for about three months until their communications dwindled to a stop. JW cited no specific reason they stopped communicating at that time.

In the winter of 2016 or early 2017, Appellant messaged JW on Snapchat and they again began communicating. In April or May 2017, after casual communications, Appellant sent JW pictures of his genitals.[9] JW described that Appellant was "either in his bed or in a tub" when he took the pictures and that he took them from a downward angle with "[h]is phone . . . in his chest area." JW described Appellant "holding his penis towards the sky" in the pictures. JW recalled Appellant sent "[m]ore than one[, but] no more than three." When she received the pictures from Appellant, JW would "click out of them immediately because [she] didn't want to see it." She also replied with statements such as, "[w]hat the f[**]k?" or, "[w]hy did you send that to me?"

---

[9] JW testified that Appellant sent pictures in April or May 2017. She also testified that these pictures were sent from the spring of 2017 to around August 2017. Upon further clarification, JW testified that the period over which Appellant sent the pictures in issue was the fall of 2016 until her birthday in August of 2017.

Appellant responded by either apologizing, saying they were meant for his girlfriend, or claiming that he did not mean to send them to JW.

JW explained that in her experience, when using Snapchat, "you can send messages and save them in the chat. But, if you don't save them, they disappear." She continued, "With the Snapchat function you take a picture and it disappears after a few seconds and then it's lost to the world, basically." On cross-examination, JW testified that she saved her Snapchat messages with everybody she communicated with on Snapchat, to include Appellant, by taking a screenshot of the messages. JW testified she was offended by the pictures because she had "been through some traumatic experiences, and that stuff doesn't sit well with [her]." She also stated that she found the pictures offensive because "it was a penis that [she] did not want to see and did not consent to see." When asked on cross-examination if it was common for her to receive unsolicited penis pictures, JW responded affirmatively. However, she explained that when Appellant sent her pictures of his penis, it was more offensive because she knew him; whereas, she did not know the other individuals who sent her "unwelcomed, unsolicited photos of male genitalia." Although JW considered the pictures offensive, she continued to communicate with Appellant until she was interviewed by the Air Force Office of Special Investigations and realized Appellant was under investigation. She explained that she did not block Appellant on Snapchat because she did not "have a lot of friends" and she still considered him a friend, at that time. JW testified that she regretted not blocking him. At all times relevant to the indecent conduct specifications involving JW, she was 16 years old and a high school student.

## II. DISCUSSION

### A. Amendments to Specifications

On appeal, Appellant claims the military judge erred in allowing the Government to make multiple changes to specifications after referral and over the Defense's objection. The changes included amendments to the location of the offenses, the charged timeframes, and removal of charged language. Appellant claims he is entitled to relief even if this court agrees with the military judge that the changes were "minor," because his ability to defend himself was substantially prejudiced by changes when considered collectively.

#### 1. Additional Background

On 10 December 2019, three charges with multiple specifications were referred to a general court-martial. Appellant was arraigned on 2 September 2020, but deferred entry of pleas. On 23 September 2020, trial counsel filed a motion for appropriate relief to amend various charges and their specifications, asserting that each proposed amendment constituted a "minor change" under Rule for Courts-Martial (R.C.M.) 603. On 30 September 2020, trial defense

counsel responded, objecting to the majority of the proposed changes. On 8 October 2020, the military judge issued a written ruling which permitted the Government to amend the specifications after he had concluded each proposed change was minor, and no material right of the accused was prejudiced. The Defense did not seek reconsideration, a continuance, a bill of particulars, or other alternative relief as a result of the military judge's ruling or the Government's changes to the specifications accomplished on 29 October 2020. The court-martial commenced on 2 November 2020.

The proposed changes and trial defense counsel's response to those changes are addressed in turn below.[10]

### a. Charge III, Specification 2[11]

Appellant was accused of indecent conduct in violation of Article 134, UCMJ. The specification initially read as follows:

> Specification 2: In that [Appellant]. . . did, at or near the world, between on or 1 November 2016 and on or about 31 December 2017, wrongfully commit indecent conduct, to wit: intentionally exposing his genitalia in an indecent manner by sending a picture of his penis to [JW], and that said conduct was of a nature to bring discredit upon the armed forces.

The Government moved to amend the following: (1) period of criminality from "between on or about 1 November 2016 and on or about 31 December 2017" to "between on or about 1 April 2017 and on or about 2 August 2017;" and (2) to exclude "intentionally exposing his genitalia in an indecent manner" without substitution.

Defense counsel did not oppose amendment (1), but did object to amendment (2). Specifically, the Defense argued that deleting the proposed language was an attempt by the Government "to reduce their burden to prove an element

---

[10] Although Appellant invited this court to consider amendments made to specifications that were either dismissed before trial or resulted in an acquittal, we decline to do so. Appellant contests certain amendments to Charge I. However, his unconditional guilty plea waived those matters for appellate review. *See United States v. Bradley*, 68 M.J. 279, 281 (C.A.A.F. 2010) ("An unconditional plea of guilty waives all nonjurisdictional defects . . . ."). We have the ability to pierce that waiver, but we decline to do so. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018) (acknowledging a Court of Criminal Appeals can pierce waiver to correct a legal error if it chooses to do so).

[11] Originally Specification 5 of Charge III, but renumbered as Specification 2 of Charge III.

of intent" and that "the proposed change is likely to mislead [the accused] as to the offense charged."

### b. Charge III, Specification 3[12]

Appellant was accused of indecent conduct in violation of Article 134, UCMJ. The specification initially read as follows:

> Specification 3: In that [Appellant]. . . did, at or near Osan Air Force [sic] Base, between on or 1 May 2017 and on or about 31 [sic] September 2017, wrongfully commit indecent conduct, to wit: intentionally exposing his genitalia in an indecent manner by sending a picture of his penis to [JH], and that said conduct was of a nature to bring discredit upon the armed forces.

The Government moved to amend the following: (1) the location where the offense occurred from "Osan Air Force Base" to "the continental United States;" (2) the period of criminality from "between on or about 1 May 2017 and on or about 31 September 2017" to "between on or about 1 November 2016 and on or about 31 March 2017;" and (3) to exclude "intentionally exposing his genitalia in an indecent manner" without substitution.

Defense counsel objected to all changes. The Defense stated simply that they opposed the location change but provided no additional reasoning and reiterated the rationale provided in Sections II(A)(1)(a) and II(A)(1)(c), *supra,* for opposing amendments (2) and (3).

#### 2. Law

"Whether a change made to a specification is minor is a matter of statutory interpretation and is reviewed de novo." *United States v. Reese*, 76 M.J. 297, 300 (C.A.A.F. 2017) (citing *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016)).

"R.C.M. 603(a) provides that '[m]inor changes in charges and specifications are any except those which add a party, offenses, or substantial matter not fairly included in those previously preferred, or which are likely to mislead the accused as to the offenses charged.'" *Reese*, 76 M.J. at 300 (alteration in original) (citation omitted). "After arraignment, the military judge may, upon motion, permit minor changes in the charges and specifications at any time before findings are announced if no substantial right of the accused is prejudiced." R.C.M. 603(e).

"A major change is one that adds a party, an offense, or a substantial matter not fairly included in the preferred charge or specification, or that is likely

---

[12] Originally Specification 6 of Charge III, but renumbered as Specification 3 of Charge III.

to mislead the accused as to the offense charged." R.C.M. 603(b)(1). Major changes made after referral "may not be made over the objection of the accused unless the charge or specification affected is withdrawn, amended, and referred anew," regardless of any demonstration of prejudice. R.C.M. 603(d)(1); *see also Reese*, 76 M.J. at 301–02.

"A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication . . . ." R.C.M. 307(c)(3). In order for Appellant to be found guilty of child abuse by indecent exposure in violation of Article 120b, UCMJ, the Government was required to prove beyond a reasonable doubt that (1) Appellant intentionally exposed his genitalia to a child *by any means*, and (2) he did so with an intent to arouse or gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45b.a.(h)(5). In order for Appellant to be found guilty of indecent conduct in violation of Article 134, UCMJ, the Government had the same burden but was required to prove: (1) Appellant engaged in certain conduct, (2) it was indecent, and (3) it was service discrediting. *See* 2016 *MCM*, pt. IV, ¶¶ 90.b.(1)–(3).

### 3. Analysis

#### a. Language

The required elements of the alleged indecent conduct are stated within the specifications as originally drafted. As such, the specifications are sufficient under R.C.M. 307(c)(3). Article 134, UCMJ, pleadings required proving Appellant's conduct was indecent and service discrediting. *See* 2016 *MCM*, pt. IV, ¶¶ 90.b.(1)–(3). The Prosecution's concern for changing the original specifications was not due to inadequate pleading, but instead conforming the specifications to the evidential proof.

Removing the words "intentionally exposing his genitalia in an indecent manner by" from the specifications of Charge III constitutes a minor change because such changes do not add a new offense, party, or "a substantial matter not fairly included in the preferred charge." *See* R.C.M. 603(b)(1). It is hard to conclude the specifications, as amended, were not "fairly included" in the initial specifications as the resulting language was already there. Simply put, even after removing the words in issue, the specifications alleged facts included within, rather than in addition to or at variance with the original specifications. For the same reasons, the changes were not "likely to mislead the accused as to the offense[s] charged." *Id.* Deleting the surplus references to Appellant's intent does not call into question what offenses were alleged and there was no indication from the Appellant or his trial defense counsel that he did not understand the offenses with which he was charged.

### b. Date

Our superior court's predecessor, the United States Court of Military Appeals, has held that if the statute of limitations is not implicated, changes to the dates of alleged offenses are generally permissible. *United States v. Arbic,* 36 C.M.R. 448 (C.M.A. 1966); *United States v. Hartzog,* ACM No. 29055, 1992 CMR LEXIS 794, at *9 (A.F.C.M.R. 9 Nov. 1992) (unpub. op.) ("Changes to the dates of alleged offenses have generally been treated as minor." (citations omitted)). Where time is of the essence of the crime, allegations concerning the date of the offense become matters of substance. However, if the amended dates of the offense are within the statute of limitations, the court has found the charge was sufficiently specific to prevent a retrial for the same offense. *United States v. Brown*, 16 C.M.R. 257, 261–62 (C.M.A. 1954). The statute of limitations was not an issue in Appellant's case, and no other reason exists for concluding time was of the essence with respect to these specifications. Accordingly, no new offense was created by the challenged amendments. Moreover, Specification 2 of Charge III was modified to condense the charged timeframe, so the modified specification was wholly within the dates of the original specification.

Even so, we are mindful that the United States Court of Appeals for the Armed Forces (CAAF) recently found that when analyzing any amendment under R.C.M. 603 to the date(s) of any charged offense, they would rely on material variance case law. *United States v. Simmons*, 82 M.J. 134, 138–39 (C.A.A.F. 2022). Any amendment to the charged timeframe beyond the "on or about" aperture discussed in material variance case law must be analyzed under the "totality of the circumstances . . . to determine whether that material variance resulted in a 'major change' under R.C.M. 603." *Id.* at 139. The CAAF and its predecessor, have held the phrase "on or about" includes several weeks on either side of the alleged date(s). *See, e.g.*, *United States v. Barner*, 56 M.J. 134, 137 (C.A.A.F. 2001) (noting "on or about" connotes a range of days to weeks); *United States v. Hunt*, 37 M.J. 344, 347 (C.M.A. 1993) (finding no material variance when there was a three-week difference between the date of the offense charged and the date of the offense proven when the pleadings used the phrase "on or about"); *United States v. Brown*, 34 M.J. 105, 110 (C.M.A. 1992) (concluding post arraignment change by seven days constituted a minor change). The CAAF further concluded that any change to the date of a charged offense—after arraignment and over defense objection—which is a different date reasonably near to the date originally charged "only constitutes a minor change" if "no substantial right of the accused is prejudiced." *Simmons*, 82 M.J. at 139; *cf. United States v. Wray*, 17 M.J. 375 (C.M.A. 1984) (finding a date

change of less than three weeks "a material and nonpermissible variance" based upon the "particular facts" of the case).[13]

A change that extends a charged time frame beyond the "on or about" window constitutes a material variance. If a material variance is in issue, "a totality of the circumstances analysis must then be conducted in order to determine whether that material variance resulted in a 'major change' under R.C.M. 603 because, for example, the amendment was 'likely to mislead the accused as to the offenses charged.'" *Simmons*, 82 M.J. at 139. (citation omitted); *see also United States v. Cochran,* 697 F.2d 600, 604 (5th Cir. 1983) (holding the fact that the indictment was off by two months as to the date of the conspiracy was not a fatal variance and did not prejudice appellants).

In Specification 3 of Charge III, the period of criminality was changed from "between on or about 1 May 2017 and on or about 31 September 2017" to "between on or about 1 November 2016 and on or about 31 March 2017." This change extended the charged timeframe on the beginning dates from 1 May 2017 to 1 November 2016, adding 181 days—or approximately 6 months—to the period of criminality. The ending dates were lessened in that the difference between "31 September 2017" and 31 March 2017 is 184 days, or approximately 6 months.[14] The extended charged timeframes were more than a few days or weeks. We find that the changed timeframe of criminality extended beyond the "on or about" window and culminated in a material variance.

We must now conduct a totality of the circumstances analysis in order to determine whether that material variance resulted in a "major change" under R.C.M. 603. A major change is one that "adds a party, an offense, or a substantial matter not fairly included in the preferred charge or specification, or that is likely to mislead the accused as to the offense charged." Unlike in *Simmons*, the Government did not wait to make the changes until after the evidence was presented at trial and they rested their case. 82 M.J. at 136. In Appellant's case, the Government moved to change dates prior to trial, the matter was fully litigated, and the military judge issued his ruling approximately one month before trial on the merits commenced. Essentially, had the date changes not been made to the extortion charge in *Simmons*, the Government would not have been able to prove the extortion specification. Another distinguishing factor is that in *Simmons*, the CAAF found that "the Government's amendment to the charge sheet made it so that the charged extortion dates preceded the

---

[13] In *Wray*, the date was not amended via a motion to amend the charge sheet after referral. Instead, the members returned from their findings having excepted and substituted the period of criminality. *United States v. Wray,* 17 M.J. 375, 375 (C.M.A. 1984).

[14] We note there are not 31 days in September, but only 30.

charged sexual assault dates, thereby enabling the Government to argue that the sexual assault was accomplished via extortion." *Id.* at 139. Moreover, in *Simmons*, the changes prejudiced the accused because the amended dates "arguably increased the seriousness of the offenses with which Appellant was charged." *Id.* at 140. The CAAF further concluded that "this change in the Government's theory of the case, which was directly predicated on—and inextricably linked with—the amended dates in the charge sheet, likely misled the accused as to the offenses which he needed to defend against." *Id.* at 140–41. In this case, we do not find that the date changes, having been made before trial commenced on the merits, would have changed the way Appellant investigated or prepared for his case. We are similarly unconvinced that the amended dates affected what evidence Appellant produced at trial or how the Defense cross-examined witnesses.

Ultimately, we find that the date changes were not likely to mislead the accused as to the offenses charged. The conclusion that the Defense was not misled to its detriment or impeded in any way is supported by the record. Appellant knowingly and voluntarily pleaded guilty to two of the specifications at issue, after the amendments were approved and without seeking any further clarification. Additionally, the record indicates trial defense counsel were fully prepared to defend under the remaining amended and litigated specifications, did so vigorously, and also did so without seeking further clarification or additional time to prepare. Therefore, we find that the material variances in the changed dates did not amount to major changes.

### c. Location

The specifications in issue conformed with R.C.M. 307 by alleging the required elements. The Discussion to R.C.M. 307 suggests that a specification should "enable the accused to understand the particular act or omission to defend against." R.C.M. 307(c)(3), Discussion (D)(i). The place of the offense, however, is not an element and it has no additional significance beyond that required by due process. As noted earlier, in response to the military judge's ruling, Appellant's counsel did not claim that he lacked notice of the criminal conduct with which he was charged. Instead, counsel asserted "the new location effectively remove[d] the Government's need to prove any location at all." While this may be true, we are not convinced that such a change to the location in light of the totality of circumstances in this case, negatively affected Appellant's ability to understand the particular act to defend against or his due process rights and therefore was not a major change.

For these reasons, we find that the military judge did not err in allowing the minor changes be made to the charges and specifications in issue.[15]

## B. Preemption and Prosecution Under Article 134, UCMJ

Appellant alleges the Government charged Appellant's indecent conduct under Article 134, UCMJ, rather than Article 120c, UCMJ, 10 U.S.C. § 920c, to ease its evidentiary burden at trial. Specifically, Appellant alleges the Government's charging decision was based on Article 134, UCMJ, being easier to prove because it requires general intent, whereas Article 120c, UCMJ, requires specific intent to be proved. While ease of proof may have been a factor in the Government's charging decision, the doctrine of preemption does not compel the Government to pursue the more challenging charging scheme when faced with two lawful charging choices.

### 1. Law

"Whether an offense is preempted depends on statutory interpretation, which is a question of law we review de novo." *United States v. Wheeler,* 77 M.J. 289, 291 (C.A.A.F. 2018) (citing *United States v. Cooley,* 75. M.J. 247, 257 (C.A.A.F. 2016)); *see also United States v. Robbins*, 52 M.J. 159, 160 (C.A.A.F. 1999) (holding that the preemption doctrine precludes assimilation if two questions are answered in the affirmative). "The 'preemption doctrine' limits the general article's expansive scope, prohibiting 'application of Article 134 to conduct covered by Articles 80 through 132.'" *United States v. Avery*, 79 M.J. 363, 366 (C.A.A.F. 2020) (quoting *Manual for Courts-Martial, United States* (2012 ed.), pt. IV, ¶ 60.c.(5)(a)); *see also* 2016 *MCM*, pt. IV, ¶ 60.c.(5)(a); *Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 91.c.(5)(a).

In *United States v. Kick*, the CMA defined the preemption doctrine as the

> legal concept that where Congress has occupied the field of a given type of misconduct by addressing it in one of the specific punitive articles of the code, another offense may not be created and punished under Article 134, UCMJ, by simply deleting a vital element. However, simply because the offense charged under Article 134, UCMJ, embraces all but one element of an offense under another article does not trigger operation of the preemption doctrine. In addition, it must be shown that Congress intended the other punitive article to cover a class of offenses in a complete way.

---

[15] In light of our determination that the amendments to the charges were minor, we add that Appellant waived his claims of error regarding Charge I and its specifications when he entered unconditional guilty pleas to the same.

7 M.J. 82, 85 (C.M.A. 1979) (citations omitted); *see also United States v. Erickson*, 61 M.J. 230, 233 (C.A.A.F. 2005) (finding no congressional intent to limit prosecution; therefore, the doctrine of preemption did not prevent punishing servicemembers under Article 134, UCMJ, for wrongfully using mind-altering substances which were not covered by Article 112a, UCMJ, 10 U.S.C. § 912a).

Accordingly, the preemption doctrine only precludes prosecution under Article 134, UCMJ, where two criteria are met: "(1) 'Congress intended to limit prosecution for . . . a particular area' of misconduct 'to offenses defined in specific articles of the Code,' and (2) 'the offense charged is composed of a residuum of elements of a specific offense.'" *United States v. Curry*, 35 M.J. 359, 360–61 (C.M.A. 1992) (omission in original) (quoting *United States v. McGuinness*, 35 M.J. 149, 151–52 (C.M.A. 1992)); We will "only find a congressional intent to preempt in the context of Article 134, UCMJ, where Congress has indicated 'through direct legislative language or express legislative history that particular actions or facts are limited to the express language of an enumerated article.'" *Avery*, 79 M.J. at 366 (quoting *United States v. Anderson*, 68 M.J. 378, 387 (C.A.A.F. 2010)).

"The application of the preemption doctrine is not triggered solely because the act charged under Article 134, UCMJ, contains a subset of the elements of an enumerated offense." *United States v. Seeto,* No. ACM 39247, 2018 CCA LEXIS 518, at *22 (A.F. Ct. Crim. App. 26 Oct. 2018) (unpub. op.) (citations omitted).

We find that Article 120c, UCMJ, does not cover offenses where the exposure is via a picture of genitalia sent by electronic communications. Thus, prosecuting such conduct under Article 134, UCMJ, is not preempted by Article 120c, UCMJ.

**2. Analysis**

The first step in our preemption analysis is to determine whether Congress intended to limit prosecution for a particular area of misconduct to offenses defined in specific articles of the UCMJ. *See Curry,* 35 M.J. at 360–61. As we see it, the "particular area of misconduct" in this case is sending photos of exposed genitalia to recipients 16 years of age or older via electronic communications. We observe no "direct legislative language or express legislative history," *see Avery*, 79 M.J. at 366, in the applicable version of Article 120c, UCMJ, to conclude that Congress intended to limit this type of offense to prosecutions under the 120c punitive article. Conversely, we find Article 120c, UCMJ, does not cover this particular area of misconduct. Both this court and the Army court have concluded Article 120c, UCMJ, requires the "exposure to occur in the actual presence of the victim or public" and thus, "exposure committed through digital technology outside the presence of a victim does not constitute the offense of indecent exposure." *United States v. Miller*, No. ACM 39747 2021

CCA LEXIS 95, at *20–21 (A.F. Ct. Crim. App. 3 Mar. 2021) (unpub. op.) (quoting *United States v. Williams*, 75 M.J. 663, 668 (A. Ct. Crim. App. 2016)), *rev. denied,* 81 M.J. 334 (C.A.A.F. 2021).

Moving to the second step in the preemption analysis, the indecent conduct charged under Article 134, UCMJ, does not compose a residuum of elements of Article 120c, UCMJ. Article 120c, UCMJ, indecent exposure, requires live and temporal indecent exposure. Moreover, Article 120c, UCMJ, does not incorporate the listed elements from Article 134, UCMJ. This court has previously found that Congress did not intend to address the offense of indecent conduct, specifically sending pictures of genitalia to an adult recipient through electronic communications, in Article 120c, UCMJ. *Miller*, unpub. op. at *20–21. Thus, the charged conduct does not compose a residuum of elements of Article 120c, UCMJ.

For these reasons, Appellant's Article 120c, UCMJ, preemption claim fails. It was permissible for the Government to charge the indecent conduct of Appellant under Article 134, UCMJ.

## C. Indecent Conduct—Legal and Factual Sufficiency

Appellant challenges his indecent conduct convictions for Specifications 2 and 3 of Charge III (indecent conduct) under Article 134, UCMJ, as being legally and factually insufficient. Specifically, Appellant alleges the Government failed to prove two things beyond a reasonable doubt—that he engaged in the conduct alleged and that his conduct was indecent.

### 1. Law

#### a. Legal and Factual Sufficiency

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson,* 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd,* 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every

reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). "The [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### b. Indecent Conduct

Specifications 2 and 3 of Charge III allege that Appellant wrongfully committed indecent conduct by sending a picture of his penis to JW and JH, respectively. The elements of indecent conduct as charged in this case under Article 134, UCMJ, required the Government to prove beyond a reasonable doubt that: (1) Appellant engaged in certain conduct; (2) that conduct was indecent; and (3) that under the circumstances the conduct was of a nature to bring discredit upon the armed forces. *See* 2016 *MCM*, pt. IV, ¶ 90.b. "Indecent" means "that form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." 2016 *MCM*, pt. IV, ¶ 90.c.(1).

When analyzing indecency, the "totality of the circumstances approach recognizes that the definition of indecency requires consideration of both the circumstances of the act itself and the 'societal standards of common propriety.'" *United States v. Walton*, Misc. Dkt. No. 2009-11, 2010 CCA LEXIS 250, at *6 (A.F. Ct. Crim. App. 25 Jan. 2010) (order) (citation omitted). "The determination of whether an act is indecent requires examination of all the circumstances, including the age of the victim, the nature of the request, the relationship of the parties, and the location of the intended act." *United States v. Rollins*, 61 M.J. 338, 334 (C.A.A.F. 2005) (citation omitted).

**2. Analysis**

### a. Charge III, Specification 2 – Pictures sent to JW

Appellant raises a number of arguments as to how the Government failed to establish his guilt beyond a reasonable doubt. He first contends there is insufficient evidence to establish the offense occurred. In support of this theory, Appellant points to the fact that JW was unable to definitively say *when* she received the pictures of Appellant's penis. Appellant additionally claims that the Government failed to enter any of the indecent photos into evidence. Furthermore, Appellant claims that because the military judge acquitted him of Specification 1 of Charge III, which included the same victim and similar conduct as Specification 2 of Charge III, this is proof that he should have also been acquitted of the specifications of which he was convicted.[16] Lastly, Appellant argues the conduct of which he was convicted was not indecent.[17] We disagree on all points.

The Government was required to prove that Appellant sent a photo of his genitals to JW "between on or about 1 April 2017 to on or about 31 August 2017." While JW was not able to recall the exact dates Appellant sent the pictures of his penis, she did testify that Appellant sent pictures in April or May 2017. She also testified that these pictures were sent from the spring of 2017 to around August 2017. Upon further clarification, JW testified that the period over which Appellant sent the pictures was fall of 2016 to her birthday in August 2017. Here, any inability to precisely identify when the acts occurred does little to contradict JW's description and consistent recollection of the events and does not, in itself, equate to reasonable doubt. JW's testimony is sufficient to find that Appellant sent "a picture of his penis" to her during the charged timeframe. We also note that "beyond a reasonable doubt" does not mean that the evidence must be free from conflict. *See Lips,* 22 M.J. at 684.

Appellant next contends the Government was required to enter into evidence either the indecent pictures, or JW's written responses to the pictures. We do not agree with Appellant's contention. JW testified that in her experience, when using Snapchat, "you can send messages and save them in the chat. But, if you don't save them, they disappear." Moreover, "[w]ith the Snapchat function you take a picture and it disappears after a few seconds and then it's lost to the world, basically." With respect to the pictures, there is no reason to believe this evidence existed at the time of trial. On cross-examination, JW

---

[16] This issue provides no grounds for relief. We have considered Appellant's contention and find it does not warrant further discussion. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987).

[17] The issue of whether Appellant's conduct was indecent is covered in the following subsection.

testified that while she was in high school she saved her Snapchat messages with everybody she communicated with, to include Appellant. However, there was no evidence presented as to whether the messages existed at the time of trial. Whether the messages did or did not exist makes no difference to our analysis. JW's testimony was credible and is sufficient, without additional evidence, to support the charged offense. As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to credibly testify. *See United States v. Rodriguez-Rivera,* 63 M.J. 372, 383 (C.A.A.F. 2006) (holding the testimony of a single witness may satisfy the Government's burden to prove every element of a charged offense beyond a reasonable doubt).

### b. Charge III, Specification 3— Pictures sent to JH

Appellant claims that with respect to JH, "just as with [JW], the Government failed to prove beyond a reasonable doubt that [Appellant] committed this offense." Appellant bases this claim on the lengthy friendship of JW and JH, similarity between JW's and JH's testimony, and the fact that JH's mother did not testify at trial. Appellant concludes that the similarities in JW's and JH's descriptions of the pictures in issue make "it reasonable to infer that [JH] and [JW] colluded with one another regarding their testimony." Appellant asserts JH's mother should have been called by the Government at trial to corroborate JH's testimony. We disagree on all points.

We recognize JW and JH had known each other almost 15 years, since pre-kindergarten, and were good friends. JH admitted that JW talked her into testifying. We do not agree with Appellant that this friendship resulted in them colluding with one another regarding testimony provided at trial. While there were some similarities regarding their descriptions of how the Appellant reached out to them on Snapchat and the content of the sexual pictures, there were also many differences. Specifically, JH knew Appellant personally through a mutual friend group. JW had never met Appellant in person. JH sought advice from her mother and then blocked Appellant a total of three times before ceasing communications. JW never blocked Appellant and only ceased communications when she found out that Appellant was under investigation. Additionally, Appellant responded to JW's rebuke by claiming on at least one occasion that the pictures were not meant for her, a response he never provided to JH. This court also notes neither JH nor JW knew SO, yet she described similar facts as JH and JW with regard to how she began communicating with Appellant. SO also gave similar testimony when describing the pictures that Appellant sent her. The facts support that Appellant engaged in similar conduct with all three victims, rather than the supposition that JW and JH colluded in their testimony and, therefore, rendered such testimony unreliable.

### c. Indecent Conduct

Whether something is indecent requires "an examination of all the circumstances, including the age of the victim, the nature of the request, the relationship of the parties, and the location of the intended act." *Rollins*, 61 M.J. at 334. "This totality of the circumstances approach recognizes that the definition of indecency requires consideration of both the circumstances of the act itself and the 'societal standards of common propriety.'" *Walton*, order at *6 (citation omitted).

Both JW and JH testified that they found the sexual pictures Appellant sent offensive because, among other reasons, the pictures were unsolicited and unwanted. They were both clear with Appellant that they did not want the pictures, yet he sent them anyway. Some of the indecency of the conduct in this case stems from Appellant's total disregard for the age of his recipients and his lack of respect for their wishes. Both JW and JH were only 16 years old when Appellant sent them pictures of his genitalia. Both knew him from high school. He was not in a dating relationship with either JW or JH. Appellant accessed them through Snapchat messaging where they could be reached in the privacy of their own homes, but still not safe from Appellant's exploitative reach. We find that a rational factfinder could conclude Appellant's conduct, under these circumstances, offends societal standards of common propriety and thus, was indecent.

### d. Service Discrediting Conduct

Service discrediting conduct is conduct "which has a tendency to bring the service into disrepute or which tends to lower it in public esteem." 2016 *MCM*, pt. IV, ¶ 60.c.(3). In *United States v. Phillips*, 70 M.J. 161, 165 (C.A.A.F. 2011), the CAAF held that "[w]hether any given conduct violates clause 1 or 2 is a question for the trier of fact to determine, based upon all the facts and circumstances; it cannot be conclusively presumed from any particular course of action."[18] Appellant argues that

> [a] member of the public considering [JW's] age (16 years old), [Appellant's] age (19 years old), [Appellant's] lack of intent in sending the photograph to [JW], the long-distance nature of his consensual, sexual relationship with his then-girlfriend . . . and, the fact that these types of pictures have become common place

---

[18] Article 134, UCMJ, makes punishable acts in three categories of offenses (referred to as clauses), not specifically in another article of the UCMJ. Clause 1 of Article 134, UCMJ, addresses conduct that is to the prejudice of good order and discipline in the armed forces, and Clause 2 of Article 134, UCMJ, addresses conduct of a nature to bring discredit upon the armed forces. *See Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 91.c.(1).

on social media applications like Snapchat, would not find this conduct of a nature to lower the service in the public's esteem.

Appellant makes similar conclusions regarding his conduct towards JH, citing her willingness to communicate with Appellant after blocking him and her reluctance to participate in the investigative process. We are not convinced.

Appellant sent unwanted, unsolicited pictures of his penis to 16-year-old high school students whom he contacted over Snapchat and with whom he had little other interaction at the time he committed his offenses, save for his social media communications. He gained the trust of JW and JH and then sent images to them, which they both testified were unwanted and offensive. It holds little weight that we now live in a world where pictures of nude genitalia are often sent over social media. We find under the circumstances of this case, a rational factfinder could conclude Appellant's conduct had a tendency to bring the service into disrepute and tends to lower it in public esteem.

We have reviewed the record thoroughly. After viewing the evidence in the light most favorable to the Prosecution, we find a rational trier of fact could have found the essential elements of indecent conduct beyond a reasonable doubt. *See Robinson,* 77 M.J. at 297–98. Additionally, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of the Appellant's guilt beyond a reasonable doubt. *See Turner,* 25 M.J. at 325. Therefore, we conclude that Appellant's convictions for indecent conduct under Article 134, UCMJ, are legally and factually sufficient.

## D. Severity of Appellant's Sentence

Appellant argues the sentence imposed by the military judge was inappropriately severe given the nature of the offenses and Appellant's age at the time of his offenses. He points to the fact that the judge was not obligated to adjudge a dishonorable discharge and could have adjudged no punitive discharge. While this observation is accurate, we do not agree that Appellant's sentence was inappropriately severe.

### 1. Additional Background

Appellant introduced no evidence in presentencing. Appellant provided an unsworn statement in a question-and-answer form, where he accepted responsibility for his crimes, expressed remorse for his actions, and apologized to his victims. Appellant also described his family situation—how his mother remarried when he was 5 years old and divorced again shortly before he joined the Air Force. He described the effects that had on him, his younger sister, and his younger brother, and how the divorce placed a burden on him to take care of his siblings. Appellant also mentioned how hard it was to leave his family when

he joined the Air Force and that he sometimes regretted joining the service when he did.

**2. Law**

We review issues of sentence appropriateness de novo. *See United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to review a case for sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to, considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d)(1), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk,* 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). Although we have discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

**3. Analysis**

The maximum sentence Appellant faced for his convictions included a dishonorable discharge, 40 years' confinement, reduction to the lowest pay grade, total forfeitures of pay and allowances, reprimand, and a fine. Trial counsel recommended a dishonorable discharge, four years' confinement, reduction to the grade of E-1, and total forfeitures. The military judge sentenced Appellant to a dishonorable discharge, 540 days' confinement, reduction to E-1, and a reprimand.

In addition to his indecent conduct convictions for sending unwanted images of his genitalia to two 16-year-old high school girls, Appellant was convicted, according to his guilty pleas, of two specifications of Article 120b, UCMJ, for committing lewd acts upon SO, a child 14 years of age. SO was called during presentencing and testified about pictures of Appellant's genitalia that he sent after she told him repeatedly she did not want them. While Appellant told the military judge that he sent SO only two pictures of his genitalia, she recalled he sent "at least five." Additionally, she testified that Appellant sent her a video of him masturbating. SO testified that Appellant sought sexually explicit pictures from her, but she declined to provide them. Appellant then engaged in a form of emotional extortion by either getting angry or threatening to commit suicide. Appellant knew SO was only 14 years old, yet he made clear that "he d[id]n't care." SO stated that Appellant's

conduct made her feel sad because she felt that he unfairly took her innocence from her and took it from her before she was ready to lose it. She further explained that she "grew up a lot faster than [she] should have."

With respect to JH and JW, both 16 years old at the time of Appellant's misconduct, each testified during presentencing and described the negative impact his conduct had on them. JH said that receiving those pictures from Appellant made her "feel like an object," and that Appellant "didn't really care about [her] feelings or anything." She pointed out Appellant "was very aware" that she didn't want anything more than a platonic friendship with him; she informed Appellant that she was "completely uninterested in him" and wanted "nothing sexual" from him. JW said when she received the messages and pictures from Appellant she felt "[j]ust disgusted" and "violated." She explained that she had trusted him as a friend but "he took [her] trust and used it in a way that he shouldn't have."

We have conducted a thorough review of Appellant's court-martial record. We conclude that the nature and seriousness of the offenses support the sentence as entered. Here, Appellant intentionally sought out young females, one of whom was only 14 years old, and sent multiple sexually explicit photos, a video, and a lewd message. His criminal behavior showed a complete disregard for the impact his actions had on his victims. We find that Appellant's points on appeal largely reiterate matters that were before the military judge when he decided the sentence, and we are confident the military judge afforded these points appropriate weight during his deliberations. Appellant submitted no matters in clemency for the convening authority to consider, and failed to specifically explain to this court why his sentence is inappropriately severe for sexual abuse towards a child and conducting himself indecently on divers occasions with multiple victims. Understanding we have a statutory responsibility to affirm only so much of the sentence that is correct and should be approved, Article 66(d), UCMJ, 10 U.S.C. § 866(d), we conclude that the sentence is not inappropriately severe and we affirm the sentence as entered.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court